7 A.3d 810

COMMONWEALTH of Pennsylvania, Appellee

v.

Lekeyia GRAHAME, Appellant.

Supreme Court of Pennsylvania.

Submitted March 25, 2010.

Decided Nov. 17, 2010.

J. Scott O'Keefe, Esq., for Lekeyia Grahame, appellant.

Peter Rosalsky, Esq., Defenders Ass'n of Philadelphia, for Defenders Ass'n of Philadelphia, appellant amicus curiae.

Hugh J. Burns, Jr., Esq., Philadelphia Dist. Attorney's Office, for Com. of PA, appellee.

BEFORE: CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY and ORIE MELVIN, JJ.

## OPINION

Justice ORIE MELVIN.

The issue presented on appeal is whether the Superior Court correctly determined that a police officer had reasonable suspicion to conduct a warrantless search of a woman's handbag for safety reasons based solely on the fact that the owner of the handbag was located inside a residence where another individual had been selling illicit drugs. For the reasons that follow, we hold that the Superior Court erred in adopting a "guns follow drugs" presumption in order to justify a protective search for weapons pursuant to *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Accordingly, we reverse the order in question.

On November 13, 2005, a drug task force composed of Philadelphia police officers used a confidential informant to make a controlled purchase of crack cocaine from D.W., a male juvenile who was dealing drugs from a house at 126 North Salford Street. As officers watched from an undisclosed location, the informant walked up to the front of the

residence, and D.W. emerged from the house. Following a brief conversation, the informant handed D.W. pre-recorded currency in exchange for two red-tinted packets of crack cocaine. Once the transaction was completed, D.W. re-entered the home, and the informant transported the drugs to a police officer who was waiting nearby.

The task force maintained surveillance on the house and arrested D.W. when he exited the structure approximately ten minutes later. After D.W. had been taken into custody, every officer in the unit approached the home to investigate further.[1] Officer Renee Russell knocked on the front door, spoke briefly with the young man who greeted her, and asked to speak to D.W.'s guardian. D.W.'s mother, Virginia, came to the door and was informed that D.W. had just sold drugs from the house. Officer Russell asked Virginia to sign a consent form permitting a search of the residence, and Virginia complied.

Upon entering the home, Officer Russell observed Appellant, Lekeyia Grahame, sitting on the living room couch with a black purse at her feet. Officer Russell asked Appellant if the purse belonged to her, and she responded in the affirmative. Without asking any additional questions, Officer Russell proceeded to open the purse and search the interior, finding a small baggie of marijuana, a container of unused plastic packets commonly used as packaging for illegal drugs, a pay stub listing 126 North Salford Street as Appellant's address, a key to the residence, and a brown bag containing $900 in cash. Appellant was arrested and charged with various drug offenses.

Appellant filed a motion to suppress the evidence seized from her purse, and an evidentiary hearing was conducted. Officer Russell testified that she searched the purse because she feared it might contain a firearm, stating "the drugs was [sic] coming out of the property[.] The boy had drugs on him and drugs and guns go hand-in-hand." N.T. Suppression

---

1. It is unclear how many police officers participated in this operation. Officer Renee Russell identified two officers by name at the suppression hearing and alluded to at least one other backup officer. *See* N.T. Suppression Hearing, 9/29/06, at 8.

Hearing, 9/29/06, at 13. The suppression court concluded that police were justified in searching the purse for weapons because they had observed drug activity at the house. The motion was denied, and Appellant was convicted of possession of a controlled substance and possession of drug paraphernalia at a bench trial. She then filed a direct appeal arguing that Virginia lacked authority to consent to a search of the house and that the search of her purse violated the Fourth Amendment to the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution.[2]

A divided three-judge panel of the Superior Court affirmed the judgment of sentence in a published opinion. With respect to the first issue, the majority found that police did not need a warrant to search 126 North Salford Street for drugs because Virginia had apparent authority to consent to a search of the residence. In support, the majority noted that Virginia answered the front door, identified herself as D.W.'s mother, signed a consent form, and invited Officer Russell inside the house.[3] *See Commonwealth v. Grahame*, 947 A.2d 762, 765 (Pa.Super.2008). Applying the totality-of-the-circumstances test endorsed in *Commonwealth v. Strader*, 593 Pa. 421, 931 A.2d 630, 635 (2007), the Superior Court concluded that the facts available to Officer Russell during the encounter would lead a reasonable person to believe that Virginia had authority over the premises.

The majority also upheld the search of Appellant's purse, reasoning as follows:

**2.** The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated...." U.S. Const. amend. IV. Article I, Section 8 of the Pennsylvania Constitution provides that "[t]he people shall be secure in their persons, houses, papers, and possessions from unreasonable searches and seizures...." Pa. Const. art. I, § 8.

**3.** Appellant never argued that she owned or leased any portion of 126 North Salford Street in support of her claim that Virginia lacked authority to consent to a search of the residence; Appellant merely asserted that Virginia did not have authority over the premises. The record is silent as to who owned or lawfully resided at the house on the day in question.

[Appellant] had a large bag, easily capable of holding a gun. Also, a few minutes prior to the search [D.W.] emerged from the house after selling drugs to a confidential informant. Drugs and guns frequently go hand in hand. The officer had a right to conduct a minimally intrusive search for weapons in order to protect herself. [D.W.] could have easily dropped a gun in the large bag on the way out of the house. This is akin to a *Terry* stop, except instead of patting down someone's body to check in pockets, the officer opened and checked a woman's handbag in her immediate control.

*Grahame*, 947 A.2d at 764 (footnote omitted). In so holding, it likened the case to *Commonwealth v. Davidson*, 389 Pa.Super. 166, 566 A.2d 897 (1989), where the Superior Court held that police had reasonable suspicion to search a purse for weapons following a traffic stop because the bag was unusually heavy, the driver of the vehicle had been arrested on drug trafficking charges, and the female passenger who owned the purse reached for the bag after a police officer had asked her to refrain from touching it.

Judge Kelly authored a dissenting opinion wherein he asserted that third-party consent to search a residence does not extend to a visitor's personal belongings and that the warrantless search of Appellant's handbag was invalid under *Terry v. Ohio, supra,* and its progeny because Officer Russell did not observe any behavior that would lead a reasonably prudent person to conclude that Appellant was armed and dangerous. In reaching that conclusion, Judge Kelly commented that the case was factually similar to *Ybarra v. Illinois,* 444 U.S. 85, 100 S.Ct. 338, 62 L.Ed.2d 238 (1979), where the United States Supreme Court held that an individual's mere proximity to suspected criminals is insufficient to justify a warrantless search for weapons, even when police are lawfully on the premises to conduct a narcotics investigation. As there were no additional reasons to conduct a warrantless search of Appellant's purse aside from Officer Russell's belief that guns tend to be found in close proximity to drugs, Judge Kelly concluded that the majority's analysis was flawed and that the

contraband seized by Officer Russell should have been suppressed.

Appellant filed a petition for allowance of appeal, and we granted review limited to the issue of whether the Superior Court erred in finding that Officer Russell had reasonable suspicion to search Appellant's purse for weapons under *Terry v. Ohio, supra,* based upon a "guns follow drugs" presumption. In reviewing the propriety of a suppression ruling, we are bound by the suppression court's factual findings if they are supported by the record. *Commonwealth v. Galvin,* 603 Pa. 625, 985 A.2d 783, 795 (2009). The suppression court's conclusions of law, however, are subject to *de novo* review and can be reversed if they are erroneous. *Id.* When the defendant is bringing the appeal, "we consider only the evidence of the prosecution, and so much of the evidence for the defense which remains uncontradicted when fairly read in the context of the entire record." *Id.*

There are no disputed factual issues in this case because Officer Russell was the sole witness at the suppression hearing, and the defense accepted her version of the incident. Thus, we need only address the Superior Court's determination that Officer Russell was justified in searching Appellant's handbag for weapons in this scenario. Appellant contends that the ruling in question ignores our pronouncement in *Commonwealth v. Zhahir,* 561 Pa. 545, 751 A.2d 1153, 1162 (2000), that Pennsylvania courts should not employ a "guns follow drugs" presumption to uphold protective searches conducted during drug investigations because reasonable suspicion is evaluated under the totality of the circumstances. She also maintains that when the evidence is subjected to the totality standard, the search of her handbag cannot pass constitutional muster because Officer Russell did not observe any unusual behavior that would lead a reasonable person to conclude that Appellant was armed and dangerous. Surprisingly, the Commonwealth has changed its position on the legality of the search, and it now concedes that the contraband

recovered from the handbag should have been suppressed.[4] Nevertheless, we will conduct an independent analysis to resolve the apparent conflict with *Zhahir* and to clarify our position on the use of the "guns follow drugs" presumption in this context.

The United States Supreme Court addressed the constitutionality of protective searches in *Terry v. Ohio, supra.* Recognizing that "American criminals have a long tradition of armed violence," the Court departed from traditional notions of Fourth Amendment jurisprudence and held that a law enforcement officer who approaches a citizen in the course of an investigation may conduct a pat-down search for weapons if the officer reasonably believes that the person is "armed and presently dangerous to the officer or to others." *Id.* at 23–24, 88 S.Ct. 1868. In adopting the reasonable suspicion standard, which enables police to stop and frisk suspects without probable cause, the Supreme Court stressed that a protective search cannot be premised on a good-faith belief that a threat of armed resistance existed; the arresting officer must be able to point to specific facts which support an objectively reasonable determination that the suspect was armed and dangerous. *Id.* at 21–22, 88 S.Ct. 1868. This indispensable requirement protects citizens from governmental overreaching because the officer's conduct, viewed in light of the attendant circumstances, must withstand judicial scrutiny in order for a search or seizure to be upheld.[5] *Id.* at 21, 88 S.Ct. 1868.

4. On direct appeal, the Commonwealth successfully argued that the search was justified because Officer Russell knew that D.W. was using 126 North Salford Street as his base of operations, she knew from experience that drug dealers often arm themselves, and it was logical for her to conclude that D.W.'s companions might also be armed and dangerous. The Commonwealth now admits that the evidence should have been suppressed because: (1) Appellant was never linked to any criminal activity; (2) she was not walking with D.W. when he was taken into custody; (3) the police did not have a warrant to search 126 North Salford Street; (4) the Commonwealth never established the nature and extent of Officer Russell's experience with the drug task force; and (5) Appellant did not make any furtive movements or appear nervous when Officer Russell inquired about the handbag.

5. In *Michigan v. Long,* 463 U.S. 1032, 1051, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Supreme Court explained that the touchstone of any

Eleven years after *Terry* was decided, the Supreme Court granted *certiorari* in *Ybarra v. Illinois, supra,* to assess the constitutionality of an Illinois statute that authorized police officers to detain and search anyone present during the execution of a search warrant in order to detect concealed weapons and prevent the destruction of evidence sought in the warrant. The controversy arose after police obtained a warrant to search a tavern and its bartender based on information that the bartender often kept large quantities of heroin inside the establishment, presumably for sale to bar patrons. When investigators arrived to execute the warrant, they promptly frisked every individual on the premises for weapons. As an officer conducted a pat-down search of patron Ventura Ybarra, he felt a cigarette pack in Ybarra's pants pocket that contained several small objects. The officer subsequently retrieved the cigarette pack, inspected the interior, and discovered six packets of heroin. Ybarra was arrested and convicted of heroin possession after a judge refused to suppress the drugs on Fourth Amendment grounds.

The United States Supreme Court reviewed the case and concluded that the heroin was the fruit of an illegal search. In reversing the judgment, the Court rejected the state's contention that the initial pat-down search was justified under *Terry,* reasoning that police cannot frisk an individual merely because he happens to be present when investigators enter a building to execute a drug-related search warrant. The Court stated:

> The initial frisk of Ybarra was simply not supported by a reasonable belief that he was armed and presently dangerous, a belief which this Court has invariably held must form the predicate to a patdown of a person for weapons. *Adams v. Williams,* 407 U.S. 143, 146, 92 S.Ct. 1921, 32

*Terry*-based analysis is the reasonableness of the governmental intrusion upon a citizen's personal security. It has also stated that "[r]easonableness, in turn, is measured in objective terms by examining the totality of the circumstances." *Ohio v. Robinette,* 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996). Courts often refer to this inquiry as the totality-of-the-circumstances test. *See, e.g., In the Interest of D.M.,* 566 Pa. 445, 781 A.2d 1161, 1163 (2001).

L.Ed.2d 612; *Terry v. Ohio, supra,* at 21–24, 27, 88 S.Ct. 1868. When the police entered the Aurora Tap Tavern on March 1, 1976, the lighting was sufficient for them to observe the customers. Upon seeing Ybarra, they neither recognized him as a person with a criminal history nor had any particular reason to believe that he might be inclined to assault them. Moreover, as Police Agent Johnson later testified, Ybarra, whose hands were empty, gave no indication of possessing a weapon, made no gestures or other actions indicative of an intent to commit an assault, and acted generally in a manner that was not threatening. At the suppression hearing, the most Agent Johnson could point to was that Ybarra was wearing a 3/4–length lumber jacket, clothing which the State admits could be expected on almost any tavern patron in Illinois in early March. In short, the State is unable to articulate any specific fact that would have justified a police officer at the scene in even suspecting that Ybarra was armed and dangerous.

The *Terry* case created an exception to the requirement of probable cause, an exception whose "narrow scope" this Court "has been careful to maintain." Under that doctrine a law enforcement officer, for his own protection and safety, may conduct a patdown to find weapons that he reasonably believes or suspects are then in the possession of the person he has accosted. *See, e.g., Adams v. Williams, supra* (at night, in high-crime district, lone police officer approached person believed by officer to possess gun and narcotics). Nothing in *Terry* can be understood to allow a generalized "cursory search for weapons" or, indeed, any search whatever for anything but weapons. The "narrow scope" of the *Terry* exception does not permit a frisk for weapons on less than reasonable belief or suspicion directed at the person to be frisked, even though that person happens to be on premises where an authorized narcotics search is taking place.

*Id.* at 92–94, 88 S.Ct. 1868 (footnotes omitted).

Thus, notwithstanding Ybarra's proximity to the target of a narcotics investigation, the Supreme Court invalidated the

search and reaffirmed that police cannot frisk an individual for weapons unless the officer observes suspicious behavior or has prior knowledge of the individual's criminal propensities. In *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Court explained that this rule applies not only to pat-down searches of the human body but to any search conducted pursuant to *Terry*.[6] Consistent with that position, the *Long* Court held that police can search the passenger compartment of an automobile for weapons during a roadside encounter "as long as they possess an articulable and objectionably reasonable belief that the suspect is potentially dangerous." *Id.* at 1051, 103 S.Ct. 3469.

These cases instruct that a protective search cannot be justified under *Terry* unless the officer can articulate facts that establish an individualized, objective basis for perceiving a threat of armed violence. In developing this precedent, the Supreme Court has made it abundantly clear that an individual's location, standing alone, does not provide sufficient grounds for a *Terry* search. *Ybarra, supra; see also Maryland v. Buie,* 494 U.S. 325, 334 n. 2, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990) ("Even in high crime areas, where the possibility that any given individual is armed is significant, *Terry* requires individualized, reasonable suspicion before a frisk for weapons can be conducted."). Furthermore, as we observed in *Commonwealth v. Zhahir, supra,* courts cannot abandon the totality-of-the-circumstances test and rely exclusively upon the preconceived notion that certain types of criminals regularly carry weapons.

The defendant in *Zhahir* was arrested on drug charges after a lawful pat-down search of his person led to the discovery of ninety-eight vials of crack cocaine. His motion to suppress the cocaine was denied, and he was convicted on all

---

6. The respondent in *Long* argued that the sweep of his car could not be upheld under *Terry* because that case applied only to pat-down searches of people. The Supreme Court rejected this claim, noting that *Terry* anticipated future developments in the protective search arena. Hence, the *Long* Court declined to interpret *Terry* "as restricting the preventative search to the person of the detained suspect." *Long,* 463 U.S. at 1047, 103 S.Ct. 3469.

counts. The Superior Court found that the cocaine was properly seized under the plain feel doctrine, which had not yet been adopted in Pennsylvania, and we granted review.[7] The defendant urged us to reject the plain feel doctrine on the basis that some courts had rendered decisions indicating that they were predisposed to uphold protective searches of drug suspects. Specifically, the defendant complained that judges had begun to take judicial notice that drug traffickers are frequently armed, thereby diminishing the protections afforded by *Terry v. Ohio.* The *Zhahir* Court condemned that practice, stating that "as a general policy consideration, taking judicial notice that all drug dealers may be armed as in and of itself a sufficient justification for a weapons frisk clashes with the totality [of the circumstances] standard, as well as the premise that the concern for the safety of the officer must arise from the facts and circumstances of the particular case." *Id.* at 1162.

*Zhahir* is illustrative of our longstanding adherence to the principles derived from *Terry* and its progeny. Pennsylvania courts have always followed *Terry* regardless of whether the appellant's claim was predicated on the Fourth Amendment or Article I, Section 8 of the Pennsylvania Constitution.[8] *See Commonwealth v. Chase,* 599 Pa. 80, 960 A.2d 108, 117 (2008). As a result, we have repeatedly declined to lessen the restrictions on protective searches despite claims that drug investigations often unearth weapons. *See Commonwealth v. Rodri-*

7. Under the plain feel doctrine, which was adopted by the United States Supreme Court in *Minnesota v. Dickerson,* 508 U.S. 366, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993), a police officer may lawfully seize contraband discovered "through the sense of touch during an otherwise lawful search" as long as the item's incriminating character is immediately apparent to the officer. *Id.* at 375, 113 S.Ct. 2130.

8. We have observed on numerous occasions that the constitutional safeguards articulated in *Terry v. Ohio* also apply to claims arising under Article I, Section 8 of the Pennsylvania Constitution. *See Commonwealth v. Revere,* 585 Pa. 262, 888 A.2d 694, 699 n. 6 (2005) (in stop-and-frisk cases, Pennsylvania courts employ the same approach regardless of whether the issue is couched in terms of the Fourth Amendment or Article I, Section 8); *see also Commonwealth v. Jackson,* 548 Pa. 484, 698 A.2d 571, 573 (1997) (Pennsylvania follows Fourth Amendment jurisprudence in matters involving *Terry* searches and seizures).

*quez*, 532 Pa. 62, 614 A.2d 1378, 1383 (1992) (refusing to lower the reasonable suspicion standard to help police fight the "war on drugs"); *cf. Commonwealth v. Lovette*, 498 Pa. 665, 450 A.2d 975, 980 (1982) (advocating scrupulous adherence to *Terry* and denouncing unnecessary police conduct that "increased the intrusiveness of the encounter"). We see no reason to deviate from this precedent in the case at bar.

By her own admission, Officer Russell conducted a protective search of Appellant's purse based on a generalization that firearms are commonly found in close proximity to illegal drugs. No one from the task force knew if Appellant had a criminal record, and there was no indication that D.W. and Appellant were involved in a common enterprise. Indeed, the police witnessed a single drug transaction, and it occurred outside of Appellant's presence. Furthermore, upon entering the house, Officer Russell did not detect any unusual behavior or furtive movements on Appellant's part nor did she observe a suspicious bulge in Appellant's purse. Since the Commonwealth failed to elicit any facts that supported an objectively reasonable belief that Appellant was armed and dangerous, the Superior Court's decision cannot be sustained.[9] *See Commonwealth v. Reece*, 437 Pa. 422, 263 A.2d 463, 466 (1970) (police officer lacked reasonable suspicion to search defendant for weapons because officer did not possess any background information on defendant, and defendant's conduct did not convey threat of danger to officer).

For the reasons stated herein, we find that the courts below erred in concluding that Officer Russell had reasonable suspicion to conduct a protective search of Appellant's handbag pursuant to *Terry*. As noted *supra*, a police officer must have a particularized, objective basis for a protective search; an

9. The record belies the Superior Court's contention that this case is analogous to *Commonwealth v. Davidson*, 389 Pa.Super. 166, 566 A.2d 897 (1989). A protective search of a woman's purse was upheld in *Davidson* because the owner had been riding in a car next to a man who possessed a large sum of cash and cocaine, and she reached for her purse after a police officer asked her not to touch it. By contrast, Appellant was cooperative with police, and she was not present during the drug transaction or D.W.'s subsequent arrest.

individual's mere proximity to others engaged in criminal activity is insufficient. Thus, consistent with *Ybarra,* the contraband discovered in Appellant's handbag should have been suppressed.

The order of the Superior Court is reversed.

Chief Justice CASTILLE and Justices SAYLOR and BAER join the opinion.

Justice EAKIN files a concurring opinion in which Justice McCAFFERY joins.

Justice TODD files a concurring opinion.

Justice EAKIN, concurring.

I concur with the majority's holding that the Commonwealth did not articulate reasonable suspicion, justifying a search of Appellant's purse. I write separately as I believe the proper disposition would have been to grant the appeal, vacate the Superior Court's order, and remand for a new trial.

As noted by the majority, the Commonwealth changed its position and now concedes "on the particular facts of this case, [Appellant's] suppression motion should have been granted." Brief for Appellee, at 2. The Commonwealth acknowledges:

[Appellant] was not a party to any drug transaction; she was not present when the drugs were sold or when the drug seller was arrested outside the residence, and may well have been unaware of any criminal activity; the police did not have a search warrant; they were not faced with exigent circumstances of any kind; the record fails to show that the officer who searched [Appellant's] pocketbook had any relevant prior experience; and the officer did not refer to anything about [Appellant's] appearance, movements or conduct that raised a safety concern. Under the totality of the circumstances, the suppression hearing transcript fails to show that the search was valid.

*Id.,* at 5.

As the Commonwealth's current position renders the issue moot, there is no need to delve into the detailed "guns follow

drugs" analysis. The frequency with which weapons appear in the drug trade may be a factor in determining if there is justification for a *Terry* search, but it is of course not the only factor in a "totality of the circumstances" analysis. In this way, it is akin to the "high crime area" analysis—presence in a high crime area alone is not sufficient to allow a search or seizure, but when combined with other factors, could establish either reasonable suspicion or probable cause. *See Commonwealth v. Thompson,* 604 Pa. 198, 985 A.2d 928, 936 (2009) (defendant's transaction on street in high crime area at night, coupled with officer's experience involving similar drug-related transactions, provided probable cause for search and seizure); *In the Interest of D.M.,* 566 Pa. 445, 781 A.2d 1161, 1164 (2001) ("[U]nprovoked flight in a high crime area is sufficient to create a reasonable suspicion to justify a *Terry* stop under the Fourth Amendment.").

Accordingly, I agree with the majority that the Superior Court's order needs to be reversed; however, it is unnecessary to use a moot case as a vehicle to discuss the so-called "guns follow drugs" factor,[1] and an order granting, vacating, and remanding would have been more appropriate.

Justice McCAFFERY joins this opinion.

Justice TODD, concurring.

I concur in the result reached by the Majority and support its rejection of a "guns follow drugs" presumption to justify a protective search for weapons. I write separately, however, to express my disagreement with certain foundational aspects of the Majority Opinion.

1. When a recurrent event gains a sobriquet such as "high crime area" or "drugs follow guns," arguments tend to give insufficient attention to the actuality justifying that shorthand, touting instead the fact it is not universally true. Focusing on situations where the inference may not be applicable does not mean there should be no consideration of the reality—that the drug trade does involve guns on a regular basis, witness our Capital Case docket, and the tautological fact it is more likely that crime is afoot in a high crime area. Constitutional analysis at the appellate level suffers when shorthand glosses over the underlying reality.

Initially, I note that the Majority sets forth an incomplete recitation of the investigative stop standard as articulated by the United States Supreme Court in *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) and its progeny. Specifically, the Majority offers that the United States Supreme Court in *Terry* held that "a law enforcement officer who approaches a citizen in the course of an investigation may conduct a pat-down search for weapons if the officer reasonably believes that the person is 'armed and presently dangerous to the officer or to others.'" Majority Opinion at 396, 7 A.3d at 814 (quoting *Terry,* 392 U.S. at 23–24, 88 S.Ct. 1868). This rendition of the *Terry* standard, however, is incomplete, as the investigatory stop must initially be lawful *before* a pat-down search for weapons may be conducted. As more fully developed by the high Court, "[t]he Court [in *Terry*] upheld 'stop and frisk' as constitutionally permissible if two conditions are met. First, the investigatory stop must be lawful. That requirement is met in an on-the-street encounter, *Terry* determined, when the police officer reasonably suspects that the person apprehended is committing or has committed a criminal offense. Second, to proceed from a stop to a frisk, the police officer must reasonably suspect that the person stopped is armed and dangerous." *Arizona v. Johnson,* —— U.S. ——, 129 S.Ct. 781, 784, 172 L.Ed.2d 694 (2009).

Furthermore, I believe the Majority's articulation of the standard morphs from a standard that echoes *Terry,* to one that is at best imprecise, and arguably incorrect. *Compare* Majority Opinion at 396, 7 A.3d at 814 ("arresting officer must be able to point to specific facts which support an objectively reasonable determination that the suspect was armed and dangerous") *with* Majority Opinion at 396, 7 A.3d at 815 ("police cannot frisk an individual for weapons unless the officer observes suspicious behavior or has prior knowledge of the individual's criminal propensities.").

Most importantly, while the Majority properly offers that "the arresting officer must be able to point to specific facts which support an objectively reasonable determination that the suspect was armed and dangerous," Majority Opinion at

396, 7 A.3d at 814 (quoting *Terry*, 392 U.S. at 21–22, 88 S.Ct. 1868), and that "a protective search cannot be justified under *Terry* unless the officer can articulate facts that establish an individualized, objective basis for perceiving a threat of armed violence," Majority Opinion at 399, 7 A.3d at 816, in analyzing whether a stop and frisk under *Terry* was justified, the Majority looks to factors that are wholly divorced from its previously-stated standards.

Specifically, the Majority observes that no one "from the task force knew if Appellant had a criminal record," Majority Opinion at 401, 7 A.3d at 817, a factor that, without more, such as a criminal history of violence, is unrelated to an individualized basis for perceiving a threat of being armed and dangerous. Similarly, the Majority states as a permissible consideration that "there was no indication that D.W. and Appellant were involved in a common enterprise," Majority Opinion at 401, 7 A.3d at 817, again, a factor irrelevant to the issue of whether the individual was potentially violent. Finally, the Majority opines that Appellant's presence "during the drug transaction or D.W.'s subsequent arrest" were factors that could inform the question of whether one was potentially threatening to a police officer's safety. Majority Opinion at 401 n. 9, 7 A.3d at 817 n. 9. Curiously, these factors set forth by the Majority all share a strong likeness to the "guns follow drugs" presumption that the Majority properly rejects. Contrary to the Majority, I would limit the analysis under *Terry* to those factors which are indicative of whether a police officer reasonably believes an individual is armed and presently dangerous.

For these reasons, I concur in the result reached by the Majority.